I think you shouldn't be touching that. Yeah, I hit it by accident. Thank you, Your Honors. Your Honors, this case was brought up on appeal, probably about 90-95% of the case the Hillsborough County Sheriff's Office prevailed at summary judgment. There was one small issue that we did not prevail on. The reason this came up to appeal prior to trial was because we did raise 11th Amendment immunity. The district court denied it based on a case that the Hillsborough County Sheriff's Office filed back in 2005, Abu Saeed, where Florida sheriffs were not provided 11th Amendment immunity because they are a county agency, not a state agency. However, this matter is very different from that matter because in this matter the function at issue was the Sheriff's Office acting on behalf of the Department of Children and Families under a state agreement with them, under state statutes where that power is vested to the Sheriff's Office, and provided by state funds solely through DCF. So it's not county money, it's not anything like that. Abu Saeed was decided the way it was because it was deputies enforcing a local ordinance. This is Sheriff's Office, Child Protective Investigation Division acting on behalf of DCF to investigate allegations of abuse, abandonment, and neglect under Chapter 39. Do I have it right though that the Florida statutes define sheriffs as county officers? It does, Your Honor. However, if this court looks at its own decision in Pelletier v. Pryne, I believe the name of that sheriff was in Georgia, Sheriff Pryne was denied back in 2012 under Keene v. Pryne. He was not given 11th Amendment immunity as a county sheriff when it came to hiring and firing his detention deputies. He reasserted in 2015 under Pelletier v. Pryne, the 11th Circuit looked at it again, but this time instead of looking at it globally as it's a county sheriff, they're never going to get 11th Amendment immunity, they looked at the specific function at issue. When doing so, under hiring and firing deputy sheriffs, they found the statutes under Georgia law where that power is vested through the state to the county sheriff. And this court basically reversed Keene v. Pryne and in Pelletier v. Pryne said you will get the 11th Amendment immunity. So yes, I do agree with you that typically county sheriffs in Florida are county agencies. However, in this specific function again, we go back to Chapter 39, which falls under DCF and the powers in dependency court. Is that true even though the grant describes the sheriff's responsibility here as one of the independent contractors? I mean, haven't we dealt with independent contractors before and said, yeah, they don't get the immunity, but the contract for the deputy sheriff? And that's one tiny piece of that, one tiny sentence within that grant agreement. There's other instances in the grant agreement that I've highlighted both the summary judgment and in the briefs where it shows where the state maintains substantial control over the sheriff's office, where DCF maintains substantial control over the sheriff's office. Similar to Sheriff Pryne, we can't just willy-nilly hire investigators and train them. We have to follow the minimum standards of the state of DCF Chapter 39 to retain them, to keep them employed, to keep them certified. Your position is the contract itself doesn't answer the question. The question is what function was being performed. The function being performed, Your Honor, was a chapter. But we would also look to how the state characterizes the sheriff. So insofar as we look abstractly enough at the question, the sheriff is a county officer under Florida law. Insofar as we look at the particular function being performed here, the sheriff is performing a function by agreement that is a state function normally performed by DCF. Correct, Your Honor. So what's the more significant part of that first issue, how Florida law defines it? The abstract position of the sheriff as being a county, not a state officer? Or the fact that in this case, the county officer, in fact, is exercising a state function pursuant to state law? It would be the second, Your Honor, which is what Pryne- Because we've looked at both of those issues. Look at both? You look at our cases, we've referenced a constitution of the state. Georgia may characterize the sheriff as a state officer. We've looked at an Abu Sayyid. What function specifically is being exercised in answering to that first question? Your Honor, the function is- That's your critical inquiry, what function? Correct, Your Honor. Correct, Your Honor. What about the second part of the test? Second part of the test, you're talking the four factors or- Yep, I'm talking about the degree of state control over the sheriff's office in performing the function. Correct, Your Honor, and that's what I was speaking of prior, 39.30653B talks about the minimum training requirements for hiring child protect investigators. It also gives us the minimum performance standards and outcomes for the division. So it's not things that the sheriff's office creates and has control over. We're following the state statute, state guidelines, DCF guidelines. Do you have day-to-day autonomy in how you go about executing these functions? I'm not sure there's a microphone on this side. It sounds like there are some performance standards, hiring and firing on the front end, some performance and maybe some sort of generic constitutional-like performance standards, but then on a day-to-day basis, how does it look? There's not DCF people following around the investigators. However, there are audits that are constantly being done. One of the reasons for the audits, if I can interrupt, constantly being done, is that the inspectors doing the work, the investigators, are subject to liability under 1983 for the violation of constitutional rights. They sometimes are sued. Even the DCF people are sometimes sued. Correct, Your Honor. So there's an enormous interest in making sure that they're doing their job the way it's supposed to be done in order to avoid liability. It's not that a fair statement? That would be a fair statement, Your Honor, but they're also interested in ensuring that these investigations are done properly. It's not just liability. No, no. Do the investigations properly when they're doing foster home care, picking up the right foster home and all those kinds of things. And again, Your Honor, that kind of goes to other arguments we have in this case. Things of that nature fall under the care managers, which are under HKI, which was previously sued in this lawsuit but settled out. Those are functions that the Sheriff's Office does not do. The Sheriff's Office only does the investigations and removal. Yeah. Correct, Your Honor. As to the third function, which was conceded both by the District Court and the plaintiff in this matter, source of funds, there's no dispute that solely this money comes from DCF. Under statute, the Sheriff's Office has to keep this state DCF money apart from its regular county treasury. I think everybody agrees about that. Correct, Your Honor. There's really nothing to argue on that one. However, we go to the fourth factor, responsibility for adverse judgments. And again, all the evidence in the record shows that any judgment that would get paid out of this matter or any other matter that child protective investigators or the division will get sued under has to come solely out of that state funding. Where does it say that? I understand that you have a statement from Major Bellara Correct. saying that if there was a money judgment in the case, it would be paid out of DCF grant money. If there wasn't enough, we'd go back to DCF. But where does it say DCF is obliged to fund the judgment against the Sheriff? Your Honor, we have to be- Sheriff, let's just assume the Sheriff plainly behaves illegally and unlawfully in the execution of this otherwise state function. Your Honor, it would have to come out of that budget because under 39-3065, these two budgets have to remain separate. No, I understand the budgets have to remain separate. But where does it say that the state is obliged to pick up the bill for misconduct by the Sheriff in executing the function? What would happen? Other than Bellara saying that it would be paid out of DCF money, what is there in the statute that suggests that that's right? Or put differently, what would have happened if the DCF said, no, we ain't paying? Your Honor, the way it would work is- I hear that would be odd because obviously the DCF settled, paid up, etc. But I'm asking a more general question. Is there anything in the law that obliges the state to pay for the misconduct of a Sheriff in executing this otherwise state function? Again, I go back to the money has to remain separate, accounting- Other than the fact that the money is maintained in a separate bank account or whatever. Correct. But through Major Bellara, it shows that how the budget works is they would have to go into that budget to pay any monies. They may have a shortfall in their budget because of that, which would then require the child protection- Let me ask the question this way. Was there any evidence, was DCF ever asked in words or substance, who pays the freight if the County Sheriff loses in a lawsuit? Who funds it? Do you do it all the time? Do you generally do it? Does it may depend on the nature of the dispute and the judgment? Was the state DCF ever asked? No, Your Honor. We don't know what they have to- Who works the budget. No, no. That's a county officer by one light of it. That's the Sheriff's guy saying it. Well, quite frankly, at this point, Your Honor, everyone that works over there is falling under the state- I know. I understand that. But DCF was never asked and DCF never answered that question. That would be a fair state of the record. Correct. The record would come from Major Ballera, who manages that budget at that time. And in fairness, I mean, there are a few things on the other side of the ledger, right? I mean, the grant itself says the extent committed by Florida law, each party will bear its own liability, right? Correct, Your Honor. And didn't the district court cite one of our decisions that says there's nothing in Florida law that requires the state to bear the burdens of local Sheriff's officers, Stanley or something like that? Your Honor, again, Stanley is very similar to the Pryne cases. Stanley is another instance where Florida Sheriff was denied 11th Amendment immunity when hiring and firing detention deputies. So again, it kind of follows the Pryne case. And I agree in Florida, under Florida law, that was a correct decision. However, this is a very different circumstance. This isn't the Sheriff doing detention functions or law enforcement. Right, but we say unambiguously in Stanley, quote, No provision of Florida law provides funds to a Florida Sheriff to satisfy a judgment against the Sheriff and that neither the state nor the county will be required to directly pay for any adverse judgment against the Sheriff's office. Is there any indemnification provided for in the grant agreement? Yeah, I don't know. There's not. It's because we get the money from DCF and it stays where it stays. Am I correct in recalling that you're self-employed? For the county part of the Sheriff's office, it is. For the Child Protection Investigation Division part, and you can find, you can see it in the documentation. I think it was through Lieutenant Morris. His affidavit had budgetary documentation showing where the money goes that comes from the state. I don't know about the cost of the insurance and whatnot would depend on whether there's immunity for that function. Correct, and that's, again, to keep that money separate. So while the Sheriff's office is self-insured as far as all its law enforcement and detention functions, Child Protection has bought insurance with the state money to cover those claims so they're not having to mix and match the monies. Mr. Dietz. Good morning, Your Honors, and may it please the Court. My name is Matthew Dietz and I, with Lisa Goodman, represent Ms. Doris Frey. This court's Abu Saeed case was clear. The only difference between the Abu Saeed case and this case is the fact that there was a major that made an assertion that they would have to ask DCF for the money, which basically has no—it's a speculative issue. However, it's not even a point in this case—it shouldn't be a point in this issue because the Sheriff's office receives federal financial assistance, and that was one of the points that I brought up in my brief. For the fact that in a summary judgment under Rule 56, for them not to put an assertion that they do not—that the specific CPI office does not receive federal financial assistance defies Rule 56, and it didn't even give me an opportunity to do a response to that. And it did not allow me to comply with Rule 56. And the court relied on a footnote in a whole section involving the Rehabilitation Act to state that they don't receive money for this specific issue. I argue that this is not an issue of material fact because the issue is whether or not the entity as a whole receives federal financial assistance, and that fact was never made. This is similar to the case that Judge Choflat released today, the Sierra versus City of Hialeah case. It's like saying that the City of Hialeah's internet department does not get any federal financial assistance, so therefore, the whole department—therefore, they're not liable under 504. It makes no sense, and this court shouldn't even reach that as the United States argued in their amicus brief. With all the other issues about how the 11th Amendment is such a—with regards to Lane, with regards to the other constitutional issues involved in this case involving the 14th and even the nature of the ADA itself is an equal protection issue. But back to Rule 56, answering a summary judgment and denying facts is not like looking for Waldo in a Where's Waldo book. As this court has said, even for courts, hunting for facts in a record is not a game—is not like trying to find truffles in a brief. That was the issue, but with regards to the issue about Abu Sayyid, the United States did a phenomenal brief on that, and Abu Sayyid is right on point. The issue—the important issue for my client and the issue for—in this case is the issue about the ADA's application to the dependency system, which has not been addressed by any circuit yet. We can ask you a question before it's time to go back to the brief. Leave sovereign immunity and launch off into the discussion of the merits. We've issued requests for jurisdictional briefing about why it is that we have tender metallic jurisdiction over any of, you know, sort of the denial of this summary judgment with respect to claim that it remains. We ran a summary judgment with respect to case claim. They gave us about eight pages in their brief about why we do have jurisdiction over aspects of the case. You haven't really told us much. Why do we have tender metallic jurisdiction over any of this? It's inextricably entwined with the merits of this case. Well, I get it that that's the legal standard, but explain to me, like, why that is in this case. I thought you were asking me a softball question. Because the issue of 11th Amendment immunity and the ADA goes part and parcel with it. What we're talking about is the right for a parent to have their own child and the extent of that right. And we were about to have a trial, and if this court remands, this court is just going to remand on the one issue involving the Olmstead rights of Ms. Furey not to have her child be sent to a nursing home and subsequently dying. It is tied in with the issue of sovereign immunity and the importance of the overall issue under the 11th Amendment argument. So I think I understood everything you just said, but I don't really think you've kind of drilled down into the fact of this case to explain to me why they're related in a way that . . . I mean, we've been pretty stingy about tender metallic jurisdiction and inextricably intertwined, and why here? I just don't . . . I don't yet think I see it. This is . . . if this case is remanded and if this court relies on Abu Sayyid, the only issue that we're going to go on is whether or not there was a violation of Olmstead pursuant to a standard which the court did not apply the correct standard. If this case is remanded, and we say there's no 11th Amendment immunity, the district court has all these claims in its bosom. It can reverse . . . revisit its prior rulings depending. Do you agree with that? Correct, Your Honor. There is no bar for that, Your Honor. It's a whole new ballgame, as it were. It would be a whole new ballgame, and preferably on the issue of the Rehabilitation Act, which would also obviate this court to even rule on the 11th Amendment immunity claim. It would seem to me, Mr. Dietz, that if there's 11th Amendment immunity, then we'd have to get to the question of whether there was abrogation in the ADA. And if we got to that question, then it seems to me to be you'd have an argument that the questions were inextricably bound together. But if we were to conclude there is no 11th Amendment immunity, I'm not sure that I see why we would reach out for pendent jurisdiction, appellate jurisdiction, because it doesn't strike me that answering those merits questions are inextricably bound up with what we were answering. Do you follow what I'm . . . I absolutely follow what you're saying, Judge Marcus. The irony is if you're right about one, you're wrong about the other. So maybe I should just sit down now. Well, I mean, you can pick either one from column A or one from column B, but I don't know you can have it both ways. You follow what I'm suggesting? I am, Your Honor. Help me with this. How do I address this? If you're right that there is no sovereign immunity, that the sheriff is basically a to get to abrogation under the ADA, which otherwise would seem to me to make the question, the merits and the jurisdictional question inextricably bound up. But if I don't have to do that because you're right that this is a county officer, then I'd have no occasion to answer this question. There'd be no reason for me to reach out to it because I don't think I have to in order to answer the first question. I would just say sheriff is a county officer because of one, two, three, four, end of story. Am I missing something here? No, you're absolutely correct, Judge Marcus. I don't think you're missing anything and we were prepared to go to trial and we would have been able to go to trial but for the appeal. To the extent that this court is questioning whether or not there is 11th Amendment immunity, I would be more than happy to talk. You see, because that's a close question, at least for me. Whether there is or is not, something's point one way, something's point the other way, you can argue it either way. But if the district court got it right, this county office, no 11th Amendment immunity, then I would have no occasion to answer the merits question. It seems to me. Might be interesting, might save some time down in the district court but why would I reach out for that? If this court does make a decision with regards to 11th Amendment immunity, then it would be pertinent. If this court is not going to make a decision with regards to 11th Amendment immunity, then there's . . . Correct. That's a pure legal question. A pure legal question based on the allegations of the complaint. Correct, Your Honor. It would be a pure legal . . . Constitutional, as I see this complaint, there's an allegation in count nine that the sheriff's office denied the plaintiff due process in lots of ways. And the same arguments are made in the Title II ADA claim. Correct, Your Honor. It's just a remedy for the constitutional violations. Correct, Your Honor. I mean, it either is or isn't, and that's a pure legal question as I see it, without getting into whether summary judgment should be granted or any of these other things. The ADA itself is an application of the 14th Amendment, as the United States said. So, to the extent that the due process or participation . . . You have to have a constitutional violation, and then the question becomes whether the ADA provides the remedy. Correct. Right. But if you're right, if we were to agree with you about the question of 11th Amendment immunity, and we were to say, county office, not state office, then I don't see why we would be reaching out for these other issues. I don't see how they would be inextricably bound up. They would clarify the issues for the court as we go . . . I think they would clarify the issues for the district court, but that's not the standard by which we determine whether we're going to reach out on an interlocutory appeal and scoop up some other questions that we otherwise would take up later. So, you've got to show it's inextricably bound, and if you're right, I don't see how you can. There's another problem. We'd be scooping up claims that are still alive down there and subject to all kinds of rulings by the district court. This court hadn't granted any final judgment. No, this was basically the . . . It's still in the bosom of the court. Correct. So, if we took pendant jurisdiction, we would be making a threshold determination that the district judge is not going to do anything different from what it's done, like that footnote on the Rehabilitation Act claim. Do you understand? The only issue . . . Absolutely, Judge Schoflat. The only issue that would come up is the fact that whether they believe the ADA applies at all to their entity, to HSCO, and what HSCO does in the CPI context. The fact is they don't believe that they have a duty or a responsibility under the ADA to provide a reasonable accommodation. If they had no duty under that law itself, as what they're saying, then it would be explicit . . . It would be intertwined because of the fact that they're saying, this is not what we do. To the extent that they say, this is not what we do, the fact is that this court should say, this is. You are bound. This is a statute that covers you with regards to programs and services that you offer in doing Chapter 39. To that extent, it may be something that's necessary in saying that whether or not it's covered by sovereign immunity or whether or not it's covered by Eleventh Amendment. Let me ask you a slightly different question, since we've moved away from this jurisdictional question of the Eleventh Amendment and veered into merits. Merits question. Correct. The ADA doesn't impose an obligation to provide a reasonable accommodation unless an accommodation has been requested. What accommodation was requested and how was it requested here? In this case, the court directly requested on behalf of the persons with disabilities in order to fully . . . Is the court ruling a request from an applicant for an accommodation? There's no reason why it couldn't, and this court has said that many times over. This court said that in Hunt v. Amco. This court said that in, most notably, in United States v. City of Hialeah. When they know that they have an obligation under the statute to do something, when they have knowledge of it, that's sufficient. You're saying the reasonable accommodation was providing care between midnight and 7 a.m.? Correct, and that was something that was . . . And that was something that was ordered. Along with visitation rights to have a hospital. Correct. What evidence is there, though, that the request, assuming that that was sufficient, maybe it was, what evidence is there to suggest that there was a denial of that request on account of Mrs. Frere's disability, as opposed to there just wasn't any money to fund home care, and they couldn't find a local facility to house the child? I see that my time is up, Your Honor. But please, if you could answer the question. Thank you. The evidence . . . The issue is whether or not it was a reasonable accommodation, a reasonable and necessary accommodation. The answer is yes, it was a reasonable and necessary accommodation. The next question that this court should ask, or any court should ask, and that was the issue with this district court, they didn't follow the test, is whether or not obtaining that . . . If it was a reasonable and necessary accommodation, why didn't they get it? It was not a fundamental alteration. It was not an undue burden. The question that this court is asking is whether or not they deliberately were indifferent to the rights by not providing the accommodation. There's no question that they could have. They were told by a person, don't bother getting it. HKI had the care ready and available and there, and they said, don't bother because you're not going to get it. Medicaid never takes 24-7 care, and they never brought it up to the judge. And the issue is that was not even correct. So they had the ability to do it. It was not an undue burden. It was not a fundamental alteration. The test that the court did, and this is the error of the court, is it's not whether they tried. It's not whether or not their attempts were successful or not, because in many times they're not. That goes into whether or not there was deliberate indifference. And this court has discussed that many times in the cases that I've been here before this court, whether it was McCollum, or whether it was Crane, or whether it was the Silva case. Whether they didn't provide an interpreter when an interpreter could have been provided is not the denial of the ADA. It's the denial of deliberate indifference. In this case, it was deliberate indifference, and that's a question for the jury. But the court mixed up its question of whether or not it was a reasonable accommodation, whether or not it was an undue burden or fundamental alteration, and then whether or not there was deliberate indifference. And that's why that's a question for the jury. And that's why I believe that this was fit for a interlocutory appeal, which I hope it isn't, because this court, I respectfully request this court to reverse and remand on the issue of the 11th Amendment. Thank you. The issue of sovereign immunity. Thank you very much for your time. Thank you, Your Honors. I just want to hit a couple things that Mr. Dietz hit on. I'm going to try to bullet point them as fast as I can. As far as the footnote to the federal financial assistance in the summary judgment, that footnote also referred to other parts of the summary judgment, such as the source of funds under the 11th Amendment argument. The court saw it very clearly. The court ruled on it. The fact that the plaintiff did and didn't respond at summary judgment, that's not our fault. But the court did note it. The court found it. And again, that footnote also said, look here, look to page 24, I believe it was, of the summary judgment when we talk about where the funding comes from to show that we don't get federal financial assistance. There's been no evidence in this case that the Sheriff's Office receives it, and there won't be any. Mr. Dietz talks about the Olmstead rights. The court was very clear, albeit in a footnote, in its order, that Olmstead doesn't apply in the situation. Olmstead applies to the patients in the facility, not Ms. Dietz as a parent. Or I'm sorry, not Ms. Freire as a parent. Other reasons why Olmstead doesn't apply. Olmstead doesn't apply when the state's treatment professionals decide that community-based care or less restrictive treatment is needed. In this case, all the medical people said, this child needs to be in a skilled facility. So again, that's another reason why Olmstead doesn't apply. As far as jurisdictional question goes, why is this ADA claim, the associational ADA claim, it's the one piece that survived summary judgment. We believe that it is intertwined with the 11th Amendment immunity, as the DOJ, in their brief, cited to, and correctly so, we believe. This court doesn't need to get to the 11th Amendment argument if there's non-constitutional grounds. So if this court were to look at the evidence in this matter, which I'm going to get to in a second, and look at what the lower court did with the individual ADA claim, with the 1983 claim, with the 1985 conspiracy claims, and applied the evidence to it, the undisputed, there's no dispute as to the evidence in this matter. I think this court would find that the 11th Amendment issue doesn't even need to be reached, because this court can rule on a non-constitutional ground that the associational ADA claim should go the way of all the other claims, and we should get summary judgment on it. Which gets me to the facts of this case. Mr. Dietz said that the accommodation came from the shelter order, and the judge at the shelter hearing saying, hey, get this 24-hour care from midnight to 7 a.m. in the home. That was made to HKI. The HKI resource specialist was at the hearing, and the transcripts in the record, the court can see where the HKI resource specialist stepped up, spoke to the judge, spoke to her own supervisor via telephone, and said, we'll try to get it done. The court never said, you will get it done under all certainty. The court said, great, try to get it done. It was put in the order that it was a conditional reunification. If that can happen, the child can then return home. HKI tried. They weren't able to get it done. Any indication that it was the sheriff's office or any sheriff's office employee that told HKI not to do it is flatly incorrect and flatly against the record evidence. What the record evidence shows is that the HKI resource specialist spoke to a nurse from CMS who had been working with this family prior to our involvement, who had been with the family when they requested this 24-hour service before our involvement, and he got denied by Medicaid. At that time, they had the chance to appeal. The family had the chance to appeal. The pediatric doctor had the chance to appeal. CMS, with that nurse, had the chance to appeal. APD had the chance to appeal. Everyone had the chance to appeal. They did not do it. That's why this nurse told HKI, it's not going to happen. Even their own expert, Ms. Montiel, said it probably wasn't going to happen in 2011 with all the cost freeze and all that. So any indication it was the sheriff's office that caused that 24-hour care not to go in the home is flatly, flatly wrong. It was HKI who does placement. It was HKI who does services. Talking about the placement issue, again, HKI was involved. All record evidence, all emails shows HKI working with CMS, working with CMAT, working with TGH social worker to find that placement. The only person that tried to keep the child local was the CPI supervisor from the sheriff's office. She's the only one that made efforts to try to keep the kid placed locally up until the morning of the transfer to Miami. Also, as far as opportunity to have a hearing, the CPI supervisor from the sheriff's office is also the only one who made efforts to notify, Ms. Freire, to notify the attorney general's office, to notify everyone so that emails went around. The fact that there wasn't a hearing wasn't because of the sheriff's office. The sheriff's office is the only person and the CPI supervisor who tried to make sure everyone was aware of what was going on so they could ask for a hearing had they wanted to. Again, it's the opportunity for a hearing. One more thing I'd like to, I'm sorry, I'm over my time. One more point I'd like to make real quick. A big issue was whether the transfer was a placement issue or a medical care issue. All the evidence in the case shows that it's a placement issue. The judge found differently. In Mr. Dietz's brief, he states that their big concern with the child going to Miami was that she wouldn't be able to visit. Again, that doesn't show, and the fact that the mother was willing for her to stay at the facility in Tampa doesn't show that she was adverse to the child going to a facility. It was a matter of where, which is placement. That's what the mother's concern was. If she goes to Miami, it's hard for me to visit. If she goes to Tampa, it's fine. That's why we were trying to keep her in Tampa. Again, it sheds light on this was a placement issue. Thank you, your honors, and I apologize for going over. The court is adjourned under the usual order.